OPINION
{¶ 1} Lucas Waters was indicted for trafficking in marijuana and carrying a concealed weapon. After his motion to suppress was overruled, Waters pleaded no contest to CCW and the trafficking charge was dismissed. Waters was found guilty of CCW and sentenced to community control standards for up to five years.
 {¶ 2} Waters has framed his assignment of error as follows:
 {¶ 3} "The Trial Court Erred By Denying Appellant's Motion To Suppress Evidence Seized As The Product Of His Unlawful Detention, And An Unlawful Search, In Violation Of His Right To Be Free From Unreasonable Searches And Seizures, As Guaranteed By The Fourth AndFourteenth Amendments To The United States Constitution And Article I, Section 14, Of The Ohio Constitution.
 {¶ 4} "A. The Court Based Its Decision To Overrule Appellant's Motion To Suppress On A Faulty Factual Scenario, Which Did Not Support The Court's Decision.
 {¶ 5} "1. The Court's Stated Version Of The Facts.
 {¶ 6} "a. Complaints of drug activity in the Cornell Market parking lot did not justify the stop and detention at issue.
 {¶ 7} "b. The record does not support the court's finding of fact that appellant was engaged in conduct that was highly suggestive of drug-related activity.
 {¶ 8} "c. The record does not disclose that Officer Simpson saw the appellant's vehicle parked in the Cornell Market's parking lot two weeks before the incident. Any possible sighting of the vehicle at a laundromat near the market two weeks before this incident is insufficient evidence to support the investigative stop.
 {¶ 9} "B. The Search That Yielded The Contraband Was An Improper Search."
 {¶ 10} The trial court rendered a comprehensive summary of the evidence and a meticulous discussion of the law. In the interests of judicial economy and to aid our disposition of this appeal, we will incorporate the majority of the trial court's decision and entry into this opinion.
 {¶ 11} "FACTS
 {¶ 12} "On March 1, 2002, Officers Rodney Hughes and Jack Simpson were investigating drug activity occurring in the parking lot of the Cornell Market located at 3509 Cornell Drive. The Cornell Drive area is known by the Dayton Police Department as an area of high drug activity. The investigation was prompted by the proprietors of the Cornell Market complaining of drug transactions occurring in the market's parking lot.
 {¶ 13} "On March 1, at approximately 3:00 p.m., Officer Hughes was in civilian clothes and in an unmarked vehicle. Officer Hughes' vehicle was parked across the street and a `couple of houses down' from the Cornell Market. (Officer Hughes' testimony). Officer Hughes was positioned so that he could observe the market's parking lot.
 {¶ 14} "Officer Simpson was in a police uniform and in a marked police cruiser. Officer Simpson's primary role was to respond to any suspicious activity Officer Hughes observed.
 {¶ 15} "In mid February, Officer Simpson, who is a ten year veteran of the Dayton Police Department, observed an older silver Chevy parked in the Cornell Market's parking lot, and he heard loud music coming from the vehicle. Officer Simpson, who was on routine patrol, ran the Chevy's plates and determined that the vehicle was owned by a female, but while testifying, Officer Simpson could not remember the female's name. Officer Simpson further testified that about ten minutes later he received a radio dispatch informing him that the Dayton Police Department had received a complaint that a silver Chevy parked in the Cornell Market's parking lot was playing loud music and perhaps selling drugs in the parking lot. Officer Simpson drove back to the Cornell Market, but the silver Chevy was gone.
 {¶ 16} "On March 1, 2002, Officer Simpson observed a 1978 silver Chevy in the Cornell Market's parking lot. He ran the vehicle's plates, and determined that it was the same vehicle he had observed two weeks earlier. Officer Simpson radioed Officer Hughes to pay close attention to the silver Chevy.
 {¶ 17} "Officer Hughes is a thirteen year veteran of the Dayton Police Department. Officer Hughes has observed numerous drug transactions occurring and he has made drug related arrests in the area of the Cornell Market. Officer Hughes testified that he observed a black male, who turned out to be Mr. Waters, in the driver's seat of the silver Chevy. Another vehicle pulled alongside the silver Chevy, and Mr. Waters exited his vehicle and got into the second vehicle. Mr. Waters was in the second vehicle for approximately one minute; he then exited the vehicle and walked back to the silver Chevy.
 {¶ 18} "Officer Hughes was not able to see what occurred between Mr. Waters and the occupants of the second vehicle, but he testified, based upon his experience, that what he observed was consistent with a drug sale. Officer Hughes explained that in recent years street level drug transactions often occur in vehicles because a vehicle provides more privacy than an out in the open transaction. Officer Hughes, based upon his observations, requested that Officer Simpson perform a field interview (FI) of what Officer Hughes thought was the one occupant of the silver Chevy. Officer Hughes candidly admitted that he did not see Mr. Waters get into any other vehicles and he was not aware of any complaints concerning the silver Chevy and drug transactions in the area around the Cornell Market.
 {¶ 19} "Officer Simpson did perform a stop of the silver Chevy. Officer Simpson testified that the vehicle actually had two occupants, Mr. Waters and Cesar Hicks, and that as he approached Mr. Waters and Mr. Hicks started to exit the vehicle. Officer Simpson ordered Mr. Waters and Mr. Hicks to remain in the vehicle while he determined their identities. Officer Simpson determined that Mr. Waters was the occupant of the driver's seat and that Mr. Hicks was the front seat passenger. Officer Simpson also observed an open bottle of alcohol in the console between Mr. Waters and Mr. Hicks. There is, however, no indication in the record that a minor misdemeanor citation was issued for this violation or that the violation played any role in the events that followed the stop. Further, a computer check of Mr. Water's (sic) driving record revealed that he had a suspended driver's license, but Officer Simpson could not arrest Mr. Waters for a driving violation because neither officer saw Mr. Waters drive the vehicle.
 {¶ 20} "Officer Simpson, after determining the occupants of the vehicle, decided to separate Mr. Waters and Mr. Hicks with Mr. Waters being placed into the backseat of Officer Simpson's cruiser. Officer Simpson, before placing Mr. Waters into the cruiser, performed a pat down search of Mr. Water's (sic) outer clothing and discovered nothing prompting further action.
 {¶ 21} "Officer Simpson then turned his attention to Mr. Hicks. Officer Simpson also performed a pat down search of Mr. Hick's (sic) outer clothing. Officer Simpson, as he was performing the pat down search, felt an object which he thought was a rock of crack cocaine. Officer Simpson asked Mr. Hicks if the object was crack cocaine, and Mr. Hicks admitted that it was. Officer Simpson then retrieved the crack cocaine and Mr. Hicks was arrested for possession of crack cocaine. Mr. Hicks filed for and received Intervention in Lieu of Conviction (ILC).
 {¶ 22} "Officer Rondeau and his partner Officer Manuel drove past the Cornell Market during Officer Simpson's encounter with Mr. Waters and Mr. Hicks. Officer Hughes requested that Officer Rondeau and Manuel assist Officer Simpson. Officers Ronadeau and Manuel pulled into the Cornell Market's parking lot, and Mr. Hicks was placed into the back seat of this cruiser. Officer Rondeau, at this point, conducted a search of the passenger compartment of the silver Chevy, and under the driver's seat a 9 millimeter handgun was discovered. Mr. Waters was arrested for carrying a concealed weapon. A complete search of the silver Chevy revealed the marijuana that resulted in the marijuana trafficking charge.
 {¶ 23} "DISCUSSION
 {¶ 24} "These facts require a discussion of two basic issues, whether the stop of Mr. Waters was constitutionally permissible and whether the search of Mr. Waters' vehicle was constitutionally permitted. The short answer to both issues is that Mr. Waters'Fourth Amendment rights were not violated, and, accordingly, the gun and the drugs need not be suppressed.
 {¶ 25} "Discussion of Whether Stop was ConstitutionallyPermissible
 {¶ 26} "Recently, the Second District Court of Appeals, in Stateof Ohio v. White, 2002 Ohio 262, used the following language to summarize when a so called Terry stop is permissible:
 {¶ 27} "In order to conduct an investigative stop of a vehicle, the officer must `be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.' Terry v. Ohio (1968), 392 U.S. 1, 21,88 S.Ct. 1868, 1880. The Ohio Supreme Court has found that `[t]he propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances,' State v. Bobo
(1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph 1 of the syllabus. The circumstances must be considered `through the eyes of the reasonable and prudent police officer on the scene who must react to events at (sic) they unfold.' Satte v. Andrews (1991), 57 Ohio St.3d 86, 87-88,568 N.E.2d 1271. For this reason, the Court must take into consideration the officer's experience and training and understand how the situation would have been viewed by the officer on the scene. State v. White at *4-5.
 {¶ 28} "In State v. White the Second District Court of Appeals discussed several cases where, using the above standard, it was determined that there was sufficient reasonable suspicion to stop a suspect and conduct an investigation. These cases include State v.Harrington, 1999 Ohio App. Lexis 3460 (Stark Cty. Ct. of App. No. 1998-CA00300, July 26, 1999) and State v. Grimes 1996 Ohio App. Lexis 4750 (Mont. Cty. Ct. of App. No. 15756, Nov. 1, 1996). Both of these case (sic) have facts which are similar enough to the facts in this case to be helpful in analyzing whether Officers Hughes and Simpson had a sufficient reasonable, articulable suspicion of Mr. Waters' involvement in a drug transaction to make the stop of Mr. Waters constitutionally proper.
 {¶ 29} "In State v. Harrington, the Stark County Court of Appeals determined that the officers who made the stop of the defendant had a reasonable suspicion of criminal activity based upon a vehicle stopping approximately one block from a suspected `crack house' located in an area of heavy narcotics activity, the vehicle's lights and engine were shut off, the defendant exited the vehicle and walked to and entered the suspected `crack house,' and the defendant, within two or three minutes of his entrance, exited the home and motioned for the parked vehicle, which contained two companions, to pick him up. In State v. Grimes, the Second District Court of Appeals found that the stop of the defendant was based upon reasonable suspicion because the defendant's activities `corresponded to the activities of others who had participated in drug transactions at the same location in the last three to four months.'State v. Grimes at *9-10. In Grimes the specific activity justifying theTerry stop of defendant's vehicle was the officers' observation that `a vehicle with a driver and a passenger pulled up to an apartment building in the middle of the night, one of the occupants left the vehicle and entered the building, returning two or three minutes later, and then the vehicle and its occupants began to leave the area.' Id. at *10. TheGrimes Court, based upon the experience of the officers who made the stop, indicated that `the entry into the building by one of the occupants of the vehicle, followed by the departure of the vehicle some two to three minutes later, at 2:40 in the morning, suggested that illegal drugs had been purchased in the building.' Id. at *13.
 {¶ 30} "This writer concludes, though the issue is close, that Officers Hughes and Simpson had a sufficient reasonable, articulable suspicion of criminal activity to make the investigative detention of Mr. Waters and his companion, Mr. Hicks. This conclusion is based upon several factors. These factors are the numerous complaints of drug activity in the Cornell Market's parking lot, the fact that the activity observed by Officer Hughes was very suggestive of a drug transaction, and the fact that Officer Simpson observed the silver Chevy in the Cornell Market's parking lot about two weeks earlier. However, the determination that the Officers had a sufficient reasonable, articulable suspicion did not include any consideration of the mid-February anonymous tip regarding the silver Chevy perhaps being involved in drug transactions in the Cornell Market parking lot. Florida v. J.L. (2000), 529 U.S. 266,120 S.Ct. 1375; State of Ohio v. Kemp 2002 Ohio 2059; State v. Riley (2001), 141 O. App.3d 409, 751 N.E.2d 525 (sic).
 {¶ 31} "Officer Hughes' observations are, obviously, the most important factor leading to the conclusion that the investigative search of Mr. Waters was proper. Officer Hughes is a thirteen year veteran of the Dayton Police Department, and he has observed numerous drug transactions, including drug sales in the Cornell Market area. Officer Hughes testified, and the Court accepts such testimony, that street drug transactions often take place inside vehicles because this provides some measure of privacy. Officer Hughes further testified, and once again the Court accepts such testimony, that Mr. Waters' activity of exiting his vehicle, walking to the vehicle that had pulled alongside Mr. Waters' vehicle and getting into this vehicle, spending about one minute in the second vehicle, and then exiting the second vehicle and walking back to the silver Chevy was, especially in light of the area's reputation for drug activity, indicative of a drug transaction. An area's reputation for drug activity is an articulable fact that is part of the totality of circumstances surrounding a stop. State v. Andrews (1991),57 Ohio St.3d 86, 565 N.E.2d 1271. These observations, along with the other factors, did provide Officers Hughes and Simpson a sufficient reasonable, articulable suspicion of criminal activity to make the stop of Mr. Waters and Mr. Hicks. This conclusion, although a close call, is appropriate in light of the dictate articulated by the Second District Court of Appeals in State of Ohio v. White, supra, that the determination of whether a reasonable, articulable suspicion of criminal activity exists must take into account a police officer's experience and training, and must be considered `through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' State v. White *5 quoting State v. Andrews, at 87-88.
 {¶ 32} "This conclusion does not end the discussion because even though the court has determined that the stop of Mr. Waters was a permissible Terry stop it must still be determined if the search of Mr. Waters' vehicle, which uncovered the weapon and the marijuana, was constitutionally permissible.
 {¶ 33} "Discussion of Whether the Search of Defendant's Vehiclewas Constitutionally Permissible
 {¶ 34} "There is, since it was the pat down search of Mr. Hicks which, ultimately, led to the discovery of the weapon and drugs in the silver Chevy, a question of whether Mr. Waters has standing to attack the pat down search of Mr. Hicks. This writer concludes that since the pat down search led to the search of the vehicle that Mr. Waters has standing to attack the pat down search.
 {¶ 35} "In Rakas v. Illinois (1978), 439 U.S. 128, 99 S.Ct. 421, the Supreme Court, through then Justice Rehnquist, significantly reduced those individuals who have standing to assert a Fourth Amendment search and seizure violation. In Rakas, the Court indicated that for a defendant to have standing he must suffer an injury and that the injury resulted from an improper invasion of a personal right, rather than an invasion suffered by another. The standing inquiry, therefore, requires a determination of whether the search and seizure at issue infringed upon an interest possessed by the defendant which the Fourth Amendment was designed to protect. Since Mr. Waters had a privacy interest regarding items located in the silver Chevy and the Fourth Amendment was designed to protect such a privacy interest, Mr. Waters has standing to attack the pat down search of Mr. Hicks which, of course, led to the search of the silver Chevy.
 {¶ 36} "First, the Court concludes that Officer Simpson had a right to conduct a pat down search upon Mr. Hicks. In Terry v. Ohio, supra, the Supreme Court ruled that during an investigatory encounter a police officer may perform a protective search for weapons when he has `reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.' Terry at 31. The Terry Court further noted that an officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man under the circumstances would be warranted in the belief that his safety was compromised. Terry
at 27. The Ohio Supreme Court has used the following language to explain when a police officer may conduct a protective search for weapons:
 {¶ 37} "The frisk or protective search approved by Terry is limited in scope to a pat down search for concealed weapons when the officer has a reasonable suspicion that the individual whose behavior he is observing at close range may be armed and dangerous. (Citation omitted). While probable cause is not required, the standard to perform a protective search, like the standard for an investigatory stop, is an objective one based upon the totality of circumstances. (Citation omitted). The rationale behind the protective search is to allow the police officer to take reasonable precautions for his own safety in order to pursue his investigation without fear of violence. State v. Andrews, supra at 89. (Citations omitted).
 {¶ 38} "The Ohio Supreme Court, in State v. Evans (1993),67 Ohio St.3d 405, 618 N.E.2d 162, had an opportunity to discuss the permissible scope of a Terry pat down search. The Evans Court stated as follows:
 {¶ 39} "Under Terry and its progeny, the police may search only for weapons when conducting a pat down of the suspect. `A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its intrusion . . . thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officers or others nearby . . .' (Citation omitted). The protective pat down under Terry is limited in scope to this protective purpose and cannot be employed by the searching officer to search for evidence of crime. (Citation omitted). Obviously, once the officer determines from his sense of touch that an object is not a weapon, the pat down frisk must stop. The officer, having satisfied himself or herself that the suspect has no weapon, is not justified in employing Terry as at pretext for a search for contraband. Evans at 414 quoting Terry v. Ohio at 25-26.
 {¶ 40} "The Evans Court also indicated that `[T]he right to frisk is virtually automatic when individuals are suspected of committing a crime, like drug trafficking, for which they are likely to be armed.'Evans at 413. (Citation omitted).
 {¶ 41} "Since Officer Simpson was investigating a potential drug transaction in an area that is known by the Dayton Police Department as a high crime and drug area, Officer Simpson had the right to conduct a pat down search of Mr. Hicks' outer clothing. The next question becomes whether Officer Simpson had the right to ask Mr. Hicks if the object that Officer Simpson felt was, in fact, crack cocaine.
 {¶ 42} "The Second District Court of Appeals has stated that `[W]hile it is not necessary that the accused be arrested in order for a Court to conclude that the accused was in custody, most Court's (sic) have concluded that Miranda is inapplicable to temporary field detentions.' State of Ohio v. Healy, 2000 Ohio App. Lexis 3480 (Mont. Cty. Ct. of App. No. 18232, Aug. 4, 2000). This conclusion is consistent with the conclusion by the United States Supreme Court in Berkemer v.McCarty (1984), 468 U.S. 420, 104 S.Ct. 3138, that a Terry stop does not trigger the need for Miranda warnings. The rationale for this determination is that a Terry investigative stop, given its limited purpose and brief duration, does not create a situation where a reasonable person would understand that a custodial situation exists. See also, Stateof Ohio v. Lee, 2001 Ohio 1457 (sic). The State v. Lee case is worth noting because in this case the Montgomery County Court of Appeals ruled that `[I]t was not necessary during (the) investigative detention that (the police officer) Mirandize (the defendant) before asking him what was in his pocket, and (the defendant's) answer furnished probable cause for seizure of what turned out to be crack cocaine.' State v. Lee at *10 citing State v. Healy, supra.
 {¶ 43} "The case before the Court cannot be distinguished. Officer Simpson was conducting a Terry investigative frisk, he asked Mr. Hicks if the substance he felt was crack cocaine, and Mr. Hicks admitted that it was. Miranda warnings were not required, and Mr. Hicks' admission that the item was crack cocaine provided Officer Simpson with probable cause to retrieve the crack cocaine.
 {¶ 44} "The final issue that must be discussed is whether, after finding the crack cocaine on Mr. Hicks, it was permissible to search the silver Chevy. The answer to this question, given the Ohio Supreme Court's recent decision in State of Ohio v. Murrell (2002), 94 Ohio St.3d 489, 202 Ohio 1483, 764 N.E.2d 986, is yes.
 {¶ 45} "In State v. Murrell, the Ohio Supreme Court, overrulingState of Ohio v. Brown (1992), 63 Ohio St.3d 349, 588 N.E.2d 113, ruled that `when a police officer has made a lawful custodial arrest of the occupant of an automobile, the officer may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.'Murrell at 496. Such a search does not violate the Fourth Amendment to the United States Constitution or Section 14, Article 1 of the Ohio Constitution. Id.
 {¶ 46} "Mr. Hicks was arrested for possession of crack cocaine, and the search of the silver Chevy following his arrest was, under Statev. Murrell, constitutionally permissible. Obviously, the discovery of the gun under the front seat and the marijuana were items that were properly discovered and, accordingly, not subject to suppression."
 {¶ 47} Waters contends that complaints of drug activity in the Cornell Market parking area did not justify the police in stopping and detaining him.
 {¶ 48} If this had been the sole basis for stopping and detaining Waters, the state (and we) agree that the police would have acted without justification. However, it was the complaints, coupled with Officer Hughes' observations of Waters' actions — which were indicative of a drug transaction — at the location about which complaints had been made, which prompted the stop and detention. The trial court reasonably determined that the complaints and Officer Hughes' assessment of Waters' actions provided the police with a reasonable articulable suspicion that Waters was involved in illicit drug activity. Although the trial court mentioned the car Waters was occupying as a factor it considered, the court minimized its importance as a factor. In our judgment, a prior sighting of the car at the Cornell Market two weeks earlier wouldn't have been necessary to justify the stop and detention, given the other factors in evidence.
 {¶ 49} Waters complains that there was no basis for finding that his actions were highly suggestive of drug related activity. He contends that what Officer Hughes observed of his behavior is "equally consistent with innocent behavior." While this may be true, this behavior was observed in a location about which the police had received numerous complaints about drug related activity. The trial court properly determined that the circumstances permitted a reasonable, articulable suspicion of criminal activity on Waters' part.
 {¶ 50} Waters next contends that the record does not support the trial court's finding that the car he was occupying March 1 was parked in the Cornell Market lot two weeks earlier, and that the lack of evidence connecting him to the car two weeks prior to March 1 demonstrates there was no basis for the stop and detention March 1.
 {¶ 51} Waters is technically correct about the trial court's finding that the car was seen in the Cornell Market lot in mid-February:
 {¶ 52} "JUDGE TUCKER: Okay.
 {¶ 53} "Officer Simpson, I have a couple questions just so I — I make sure I understand what occurred.
 {¶ 54} "I'm — I'm gonna go back to the incident with the silver vehicle that occurred — I — a couple weeks prior to March 1. And that's your best recollection, was a couple weeks prior to March 1, sometime in mid February?
 {¶ 55} "THE WITNESS: Correct.
 {¶ 56} "JUDGE TUCKER: All right. And you're obviously at that time also working in the Fifth District; is that correct?
 {¶ 57} "THE WITNESS: Correct.
 {¶ 58} "JUDGE TUCKER: And in the area of Cornell?
 {¶ 59} "THE WITNESS: Correct.
 {¶ 60} "JUDGE TUCKER: And also the Cornell Market?
 {¶ 61} "THE WITNESS: Correct.
 {¶ 62} "JUDGE TUCKER: All right. Now tell me, as best you can, about that encounter in mid-February with the silver vehicle.
 {¶ 63} "THE WITNESS: I had, uh . . . checked the area of the market. The si — — silver vehicle was in the lot. It was actually — just down from the Cornell Market, there's a, uh . . . like a laundromat there . . .
 {¶ 64} "JUDGE TUCKER: Mmm Hmm.
 {¶ 65} "THE WITNESS: . . . and it was in front of that. It was actually backed up into a space, uh . . . with the — the back of the vehicle toward the — toward the store."
 {¶ 66} It is clear to us that the slight inaccuracy of the trial court's finding is of little, if any, significance. It is also clear from the evidence that the car observed in front of the laundromat in mid-February is the same car Waters was occupying March 1. The trial court expressly disavowed considering the anonymous tip connecting the car with drug activity in determining whether the stop and detention March 1 was justified. At most, the trial court seems to have determined that Officer Simpson's observation of the car on March 1 in approximately the same location as it was observed in mid-February made it worth watching on March 1. Regardless of the significance the trial court attached to the same car being sited at or near the Cornell Market lot twice in two weeks, the other circumstance — complaints about drug activity and Waters' actions at the scene March 1 — were sufficient to justify the stop and detention.
 {¶ 67} Waters' complaint about the search of the car implicates the frisking of Hicks and his admission that he possessed crack cocaine.
 {¶ 68} Waters contends that a frisk for weapons was not justified, but we conclude that the trial court properly determined that it was.
 {¶ 69} Waters next contends that Hicks' admission that he possessed crack cocaine — which resulted in his arrest and justified a search of the car — was coerced and unMirandized such that the fruits of the arrest — the gun and marijuana found in the car — should have been suppressed.
 {¶ 70} On the issue of coercion, the testimony of Officer Simpson was as follows:
 {¶ 71} "Q. Again, h — you questioned him b — did he have a little rock on him, he didn't say anything, you had to ask him again: `You got a little rock of rock cocaine in your pocket, don't ya'?' And he finally — he fessed up and said yeah.
 {¶ 72} "A. Basically, yeah."
 {¶ 73} The trial court did not address whether Hicks' admission was coerced. In our judgment, the evidence does not demonstrate coercion sufficient to warrant suppression, if, indeed, there was any coercion at all. Furthermore, we agree with the trial court that the circumstances did not require Officer Simpson to Mirandize Hicks before asking him if he possessed crack cocaine.
 {¶ 74} The assignment of error is overruled, and the judgment will be affirmed.
GRADY, J. and YOUNG, J., concur.